29 C.C.P.A.(Patents)

FARNSWORTH v. BROWN et al.

Patent Appeal No. 4522.

Court of Customs and Patent Appeals.
Dec. 29, 1941.

Edwin M. Martin, of Fort Wayne, Ind. (Harry E. Downer, of Fort Wayne, Ind., of counsel), for appellant.

Harry G. Grover, Harry Tunick and Charles H. Brown, all of New York City, for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

GARRETT, Presiding Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office affirming that of the Examiner of Interferences awarding priority to Brown and Roberts upon certain counts involved in an interference declared by the Primary Examiner between a divisional application of Brown and Roberts and a patent issued to Farnsworth. The subject matter, as stated in the decision of the Examiner of Interferences, "relates to electron multipliers and the method of operation thereof." We assume from the record that one purpose of the device and method is television use.

The case turns on the right of Farnsworth to rely upon an application (Farnsworth Exhibit K) filed May 7, 1935.

The board states:

"The interference involves Farnsworth patent No. 2,091,439, the application for which was filed February 24, 1936, and an application of Brown and Roberts No. 97,-722 filed August 25, 1936, which is a division of an application, Serial No. 46,980 filed October 28, 1935, and which has since matured into Patent No. 2,121,067.

"The sole question which Farnsworth brings forward is whether or not his earlier filed U. S. Patent No. 2,071,517 discloses the subject matter of the present counts. If it does not, Farnsworth cannot prevail on these counts."

To state the matter differently, it is the claim of Farnsworth that the subject matter of the appealed counts was disclosed in an application, filed May 7, 1935, which, on February 23, 1937, matured into patent No. 2,071,517, and a copy of the application, serial No. 20,157, including the "File Wrapper and Contents," was introduced in evidence as Farnsworth Exhibit K. It is conceded by Farnsworth that unless the subject matter of the counts is disclosed in such exhibit, he cannot prevail, and it is, in effect, agreed by Brown and Roberts that if they are so disclosed Farnsworth is entitled to the award of priority. It appears that all the appealed counts were taken from Farnsworth's patent No. 2,-091,439.

As the junior party the burden rested upon Farnsworth to prove his case by a preponderance of the evidence (the applications having been copending) and he took testimony. Brown and Roberts

took no testimony and so are confined to the filing date of their original application, October 28, 1935.

The interference was declared upon eleven counts, numbered consecutively 1 to 11. The Examiner of Interferences awarded Farnsworth priority as to count 2 and Brown and Roberts took no appeal from his decision. Priority as to all the remaining counts was awarded Brown and Roberts upon the ground that Farnsworth failed to disclose the subject matter of the counts in Exhibit K, and the board affirmed the decision of the Examiner of Interferences.

Farnsworth acquiesced in the decision of the board as to counts 1, 3, 4, and 10, but appealed to this court as to counts 5, 6, 7, 8, 9, and 11, which we here quote:

"5. In an electron multiplier wherein electrons are directed against a cathode surface to produce secondary emission therefrom, the method of power production comprising oscillating electrons against and away from said surface to produce an electron cloud augmented by secondary electrons at each impact therewith, abstracting from the cloud through apertures in said surface a definite proportion of the electrons therein, and absorbing the energy from the abstracted electrons.

"6. In an electron multiplier structure wherein an electron cloud is oscillated against and away from a surface to produce secondary emission therefrom upon impact therewith, the method of abstracting power from said cloud which comprises feeding energy to said cloud and abstracting energy from said cloud within different spatial boundaries.

"7. In an electron multiplier structure wherein an electron cloud is oscillated against and away from a surface to produce secondary emission therefrom upon impact therewith, the method of abstracting power from said cloud which comprises dividing said cloud at each impact feeding energy to one portion of said cloud to continue multiplication and abstracting useful energy from the other portion.

"8. In an electron multiplier structure wherein an electron cloud is oscillated against and away from a surface to produce secondary emission therefrom upon impact therewith, the method of abstracting power from said cloud which comprises feeding energy to electrons traveling along one set of paths, changing the paths, and abstracting power from said electrons while in said changed paths.

"9. In an electron multiplier structure wherein an electron cloud is oscillated against and away from a surface to produce secondary emission therefrom upon impact therewith, the method of abstracting power from said cloud which comprises feeding energy to electrons traveling along one set of paths, continuously diverting a portion of said cloud into a different set of paths, and absorbing energy from said electrons while in said different paths."

"11. In combination, a pair of opposed electrodes capable of emitting secondary electrons at a ratio greater than unity, a second pair of opposed electrodes incapable of emitting secondary electrons, adjacent said first pair, means for feeding energy to electrons in the space between said first pair of electrodes to produce electron multiplication by cyclical impact therewith, and means associated with said second pair of electrodes for absorbing power from said electrons."

It will be observed that all the appealed counts, except No. 11, are method counts. Counts 1, 3, and 4, as to which no appeal to us was taken, are for a device, as is No. 2 awarded to Farnsworth by the Examiner of Interferences and not appealed to the board, while unappealed count 10 is a method claim.

In the respective decisions of the tribunals of the Patent Office certain counts not before us were grouped for discussion with some of those which are before us. This was natural and proper, of course, but as a result of it we have experienced some difficulty in our study of the case.

For example, the Examiner of Interferences said:

"Counts 1 and 9 recite a means and the method respectively of *diverting* a portion of the cloud of electrons, counts 3, 4 and 7 recite *dividing* and *abstracting* a portion of the electrons, count 5 recites the *abstraction* of a portion of the electrons while counts 8, 9 and 10 recite the *changing, diverting* or *shifting* of the electrons to a different set of paths." (Italics quoted.)

The board quoted only counts 1 and 3, neither of which were included in the appeal to us. We assume they were quoted as illustrative. After quoting them and analyzing a figure of the drawings of

Farnsworth patent No. 2,091,439, the board said inter alia:

"Count 1 involves the limitation 'means for *diverting* a portion of said cloud into a space apart from that bounded by said surfaces.', which in this figure [of patent 2,091,439] apparently refers to the positively charged anode 10. Count 9 contains a similar limitation.

"Other counts use the expression 'means for abstracting, etc.' and count 10 employs the expression 'shifting the oscillation to a different predetermined path, etc.'" (Italics quoted.)

At a later point, after describing the pertinent parts of the Farnsworth patent, No. 2,071,517, embodied in Exhibit K, the board said:

"It is our view that the position of the Examiner of Interferences is correct. Merely providing a perforated electrode will permit some of the electrons to pass through it but we do not think that the openings serve to 'divert' or 'abstract' or 'shift' the electrons into the space between electrodes 2 and 5. The count in our opinion requires some means to positively move the electrons. * * *"

As we interpret the respective decisions of the tribunals of the Patent Office, it was held that those counts grouped for discussion as above recited were not supported by the disclosure of Farnsworth Exhibit K as to the following limitations: (a) "* * * means for diverting a portion of said cloud into a space apart from that bounded by said surfaces * * *" (expressed in unappealed device count 1); (b) "* * * means for dividing said cloud at the plane of one of said surfaces, means for abstracting one of the divided portions from the space bounded by said surfaces, * * *" (expressed in unappealed device counts 3 and 4); (c) "* * * abstracting from the cloud through apertures in said surface a definite proportion of the electrons therein, * * *" (expressed in appealed method count 5); (d) "* * * dividing said cloud at each impact feeding energy to one portion of said cloud to continue multiplication and abstracting useful energy from the other portion" (expressed in appealed method count 7); (e) "* * * changing the paths [of electrons], and abstracting power from said electrons while in said changed paths" (expressed in appealed method count 8); (f) "* * * divert-ing a portion of said cloud into a different set of paths, * * *" (expressed in appealed method count 9); and (g) "* * * shifting the oscillation [described in the count] to a different predetermined path, * * *" (expressed in unappealed method count 10).

Appealed counts 6 and 11 will be more particularly discussed at a later point in this decision.

The brief for Farnsworth states: "No appeal is taken as to Counts 1, 3, 4 and 10 by Farnsworth which are relatively narrow counts directed to specific details."

While we are not directly concerned with the counts as to which no appeal was taken, it has been deemed proper to set forth the action relative to them as an aid in the effort intelligently to discuss those which are before us, and, furthermore, as to certain specific features, we think there is a significance in Farnsworth's failure to press his claim to them to which reference may properly be made, particularly in view of certain of his arguments based upon the allowance to him of count 2.

Before us Farnsworth has placed emphasis upon the allowance to him of count 2 by the Examiner of Interferences and the fact that Brown and Roberts did not appeal from that award. The count is for structure and the concluding portion of it reads: "* * * one of said surfaces being apertured to allow a portion of said cloud to pass therethrough at the time of each impact, and means for *absorbing* power from the electrons passing through said apertures." (Italics ours.)

We deduce from the decision of the Examiner of Interferences that the concluding clause, "means for absorbing (etc.)", constituted the bone of contention respecting this count and he specifically pointed out the structural features shown in Exhibit K which, in his opinion, constituted such means.

We do not find that any of the appealed counts (or any of those not appealed) were denied Farnsworth because of any *"absorption"* means or method. By reference to the quotation from the decision of the Examiner of Interferences above stated, it will be observed that he italicized the words "diverting," "dividing," "abstracting," "abstraction," "changing," and "shifting." With respect to these he said:

"All of these terms recited in the counts seem to necessitate a positive action on the electrons after they have passed through the perforated anode and it is not believed that they are supported by any device such as the Farnsworth patent 2,071,517 which merely permits the electrons to fall to the absorbing surface if they will."

Such terms as were named by the board have been quoted, supra, and need not be repeated. It made no reference to the term *"absorbing."*

The foregoing with respect to the terms "absorbing" and "absorption" has been pointed out because of the fact that, as we interpret parts of the brief before us on behalf of Farnsworth, it seems to be his theory that the term "abstracting," as used in different of the counts is synonymous with the term "absorbing." For example, the brief, inter alia, says of appealed count 8:

"The final step calls for 'abstracting power from said electrons while in said changed paths'. The power abstraction in Exhibit K occurs when the electrons in the equipotential spaces impact the electrodes 5-5. The Examiner of Interferences so held when he awarded Farnsworth priority with respect to Count 2 * * *. Since no appeal was taken from this holding, the party Brown and Roberts has admitted this."

Substantially the same thing is said of the limitation "abstracting useful energy from the other portion" in appealed count 7. (For explanation of numerals, 5-5, see facsimile and explanatory matter hereinafter appearing.)

Count 2 contains the word "absorbing" but not the word "abstracting." It does not contain the terms "dividing," "diverting," "shifting," or "changing." We think it obvious that the tribunals of the Patent Office, in interpreting the counts, must have made a distinction as to the meaning of the respective terms, "abstracting" and "absorbing," and it appears to us that there may be a distinction.

It seems to us legitimate to state that we deduce from Farnsworth's failure to appeal as to the device counts 1, 3, and 4 that he, in effect, conceded that his Exhibit K did not disclose structural means for "diverting" or "dividing" the electron clouds. It may be that they are "relatively narrow counts directed to specific details" which appears to be the reason stated in

the brief for not including them in the appeal to us, but it is scarcely conceivable that the bearing which structure of that nature, if present, would have had upon the appealed method claims, or some of them at least, could have been wholly overlooked. A careful analysis of the appealed counts leads to the conclusion that the "method of abstracting" consists in or comprises dividing or diverting the electron clouds, so as to get them into a different set of paths, or to change the paths. It would seem to us, superficially at least, that if Farnsworth Exhibit K had disclosed means for dividing and diverting, there would have been little difficulty with respect to the method counts.

We have studied the analyses of the different counts made in the brief for Farnsworth with great care in the light of the disclosures embraced in Exhibit K. A facsimile of Fig. 2 of the exhibit, upon which he relies principally to establish disclosure, is herewith presented.

The board, after describing, evidently for the purpose of comparison, Fig. 2 of the Farnsworth patent 2,091,439, the one involved here, and pointing out the features which there disclosed the subject matter of the counts, described Fig. 2 of Exhibit K, upon which Farnsworth must rely, as follows:

"In the patent No. 2,071,517, Fig. 2 discloses an electron multiplier having a central open mesh anode grid 4 and a pair

of cathodes A and B at opposite sides of this grid. Each cathode comprises a collecting electrode 5 spaced from a screen 2. The electrode 5 and screen 2 are electrically connected together at their ends by means of conductors 6, 6."

The board then stated that Farnsworth patent 2,091,439 "shows means for positively acting on the electrons, namely anode 10 [an element shown in Fig. 2 of patent No. 2,091,439], but his prior patent No. 2,071,517 does not show such means."

The analysis of Fig. 2 of Exhibit K made by the board does not seem to be questioned, but the brief for Farnsworth, says:

"Although the device of Exhibit K may be used as a straight current multiplier * * *, as connected in Fig. 2, it operates as an oscillator. In the operation of this device as an oscillator, free electrons initially existing in the space between the cathodes 2-2 are accelerated toward one or another of these cathodes by the potentials applied to the anode 4 and the cathodes 2-2. When the electrons strike either of the cathodes 2-2, they cause secondary emission at a ratio greater than unity. This cloud of electrons between the cathodes 2-2 will oscillate in synchronism with the high-frequency potential appearing across the resonant circuit 16-17.

"Some of the electrons constituting the oscillating electron cloud are diverted or pass through the apertures of the cathodes 2-2. These diverted electrons pass into the areas bounded by collecting electrodes 5-5 and cathodes 2-2, and they impinge the electrodes 5-5, to which they give up their energy, which energy is thereafter used by the resonant circuit 16-17. Thus, the electrons are multiplied in the region between the cathodes 2-2, some of the multiplied electrons are divided or diverted into the areas bounded by the electrodes 5-5 and the cathodes 2-2, and when these electrons are in these areas, they give up their energy to the electrodes 5-5."

That various structural features of the appealed method counts recited in their several introductory clauses are disclosed in Fig. 2 of Exhibit K is obvious, but (except as to count 11) we are not concerned with structure. The question is whether the *method* of the counts is disclosed, particularly the specific limitations which have been recited above in detail as to counts 5, 7, 8, and 9, the counts now under discus-

sion, and with respect to this it seems to us that any conclusion regarding it would of necessity be purely speculative. The specification of Exhibit K throws practically no light, so far as we can determine, upon the crucial question of whether in the use of such means as are disclosed the method of the counts would be obtained.

We think it clear from the brief and argument on behalf of Farnsworth that it is virtually conceded that no definite means are shown for supplying the actions called for in the above cited limitations of the appealed method claims, 5, 7, 8, and 9.

■ It is contended, however, by Farnsworth, in effect, that it was not necessary to disclose means in support of the method claims, and that the holding of the Examiner of Interferences that all the terms ("diverting," "dividing," "abstracting," "changing," "shifting," the latter term appearing in only unappealed claim 10) recited in the counts "seem to necessitate a positive action on the electrons after they have passed through the perforated anode" (approved by the board which said, "The count [referring particularly to illustrative count 1] in our opinion requires some means to positively move the electrons") read limitations into the counts and urges the familiar rule, as expressed, for example, in the case of Altvater v. Knight, 82 F.2d 608, 611, 23 C.C.P.A. (Patents) 897, that "courts may not, in an interference proceeding, read limitations into a count which are not clearly expressed therein."

Farnsworth insists that this presents a question of law and the brief on behalf of Brown and Roberts asserts that it is raised before us for the first time. We do not find any discussion of it as a limitation in the decision of either of the tribunals of the Patent Office.

The rule with respect to not reading unexpressed limitations into the counts of an interference is well settled, but, where a question of this nature is presented, it is necessary to examine the language complained of with care to determine whether such language in fact constitutes an unexpressed limitation, or whether it is an obvious concomitant of an expressed subject matter.

■ It may not be overlooked that it is a condition precedent to the obtaining of a patent that the applicant shall, in his written application, describe his claimed

invention or discovery in "such full, clear, concise, and exact terms as to enable any person skilled in the art * * * to make, construct, compound, and use the same." This, of course, applies to method as well as to structure.

█ It seems to us that the language which Farnsworth here insists is an unexpressed limitation read into the counts is not such in the sense in which the term "limitation" is used in patent law but that it describes a condition which must be present to give vitality to the expressed limitations. The reasons of appeal as to counts 5 to 9, inclusive, are, therefore, held to be without merit.

Of count 6 (which, it may be said, was not specifically mentioned in the decision of the board) the Examiner of Interferences said: "Count 6 recites the method of abstracting energy from the electron cloud within different spacial boundaries from those wherein energy is fed to the cloud and it does not appear that this method is supported by the disclosure in the Farnsworth patent under discussion. The absorbing surfaces 5 are directly connected to the emissive surfaces 2 and any energy that may be supplied is supplied through the entire space between surfaces 5 and hence the energy can not be said to be absorbed in any different spacial boundary."

The brief on behalf of Farnsworth states: "After the electrons pass through the apertures in the cathodes 2-2, they enter into the spaces between the cathodes 2-2 and the electrodes 5-5 and it is then that energy is absorbed from the electrons. In the space between the cathodes 2-2, there exist an electrical field and a gradient of electrical potential, while no electrical field and no potential gradient exist in the spaces between the cathodes 2-2 and the electrodes 5-5. It is evident, therefore, that these spaces are different physically as well as electrically. The potential applied to the anode 4 is effective in creating an electrical field in the area between the cathodes 2-2, whereas it is not effective in creating an electrical field in the spaces between the cathodes 2-2 and electrodes 5-5. This is true because the cathodes 2-2 shield the equipotential spaces against the effect of the potential applied to the anode 4. It is appreciated by the party Farnsworth that jumpers 6-6 connect electrodes 5-5 and cathodes 2-2. It is because of these connections that the areas between the cathodes 2-2 and electrodes 5-5 are *equipotential*. However, jumpers 6-6 cannot, in any sense, be said to create one spatial boundary out of separate and distinct spatial boundaries. Exhibit K shows a *separate spatial boundary* in which an electric field exists and in which energy is fed to a cloud of electrons (the spatial boundary between the cathodes 2-2) and *different spatial boundaries, separate and distinct both electrically and physically,* in which energy is abstracted from 'said cloud'. These latter areas are the ones bounded by the cathodes 2-2, the electrodes 5-5 and the jumpers 6-6." (Italics quoted.)

If the foregoing quotation from the brief had appeared in substance in the specification of Exhibit K, it is possible that a different situation relative to count 6 might have been presented, but we fail to find in the specification anything which teaches what is stated in the brief. We are not at liberty to speculate about a matter of method based solely upon a drawing, which matter, had it been regarded as important at the time of the filing of the application embodied in Exhibit K, surely would have been definitely described in the specification. Farnsworth evidently did describe it to the satisfaction of the Patent Office tribunals in the specification of the application upon which the involved patent was based, but we are unable to find where he described it in the application here critical.

██ Furthermore, great weight must be given to the findings of the experts of the Patent Office, particularly upon a question of a highly technical character such as is here before us. We are not at liberty to reverse such findings unless convinced that they were manifestly erroneous, and we are not so convinced as to count 6.

As has been indicated, count 11 is a device count. Both tribunals below discussed it separately from the other counts and both rejected it for the same reason, which appears in the following statement of the board: "Count 11 also fails to read on the prior patent because it recites a pair of opposed emissive electrodes and a second pair of non-emissive electrodes adjacent the first pair. The screen 2 and absorbing electrode 5 of the prior patent are electrically tied together and constitute a single electrode and therefore the patent fails to show separate and distinct pairs of electrodes as required by the count."

It will be noted that count 11 contains certain statements of a functional char-

acter which, while explanatory of the operation of the structural features, do not affect the question of the structure itself so far as the issue before us is concerned. The count clearly calls for a pair of electrodes. Fig. 2, supra, of Exhibit K, discloses the elements 5-5 which the specification designates as "collecting electrodes," and the elements 2-2 designated as "screens." These are tied together by the elements 6-6 designated as "jumpers."

From such knowledge as we possess respecting the action of electrical currents, we are unable to discern how the electrodes and screens thus tied together may constitute other than a single electrode, as was held below, and we are not convinced of error as to this by the analysis and argument presented by Farnsworth's counsel.

For the reasons stated, the decision of the board is affirmed as to all the appealed counts.

Affirmed.